**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

GREER COALITION, INC.; THE CENTER
FOR BIOLOGICAL DIVERSITY,

       Plaintiffs,

 vs.

UNITED STATES FOREST SERVICE,
et al.,

       Defendants.

No.  CV09-8239-PCT-DGC

**ORDER**

   This action is brought under the Administrative Procedure Act ("APA") to challenge Defendants' approval of an exchange of forest service land for private land. Plaintiffs are the Greer Coalition, a group of concerned citizens who live near or enjoy the Greer Recreation Area, and the Center for Biological Diversity, a non-profit organization involved in species and habitat protection issues in the Southwest. Defendants are the United States Forest Service; Tom Tidwell, Chief of the Forest Service; Faye L. Krueger, Appeal Deciding Officer of the Forest Service; and Chris Knopp, Supervisor of the Apache-Sitgreaves National Forest.  Plaintiffs have filed a motion for summary judgment (Doc. 41) and Defendants have filed a cross-motion (Doc. 48).  The Court heard oral arguments on February 4, 2011.  For reasons that follow, the Court will grant summary judgment in favor of Defendants.

# I.      Background.

On December 5, 2000, Federal Land Exchange, Inc. submitted a formal proposal to the Forest Service to exchange three parcels of land owned by Herb Owens (the "Owens Parcels") for two tracts of federal forest land in Greer, Arizona (the "Greer Parcels").  AR Doc. 10.[1]  The exchange transaction has been referred to as the "Black River Land Exchange" ("BRLE") because two of the Owens Parcels are located on the West Fork of the Black River.

The Greer Parcels consist of two tracts of land owned by the Forest Service.  Tract A consists of approximately 70 acres and Tract B consists of approximately 267 acres, for a total of 337 acres.  The tracts include no structures, are covered by Ponderosa Pine and undergrowth, and include no riparian or wetland habitat.  Both tracts are located on State Highway 373.  If the exchange is completed, a Forest Service road that crosses Tract A will be closed and a public hiking and cross-country ski trail that crosses Tract B will be closed.  AR Doc. 332 at 5276; AR Doc. 376 at 5877.

The Owens Parcels consist of three tracts known as the Thompson Ranch Parcel (157.91 acres), the Rancho Alegre Parcel (79.76 acres), and the Blue River Ranch Parcel (158.68 acres), for a combined total of 396.35 acres.  AR Doc. 376 at 5877-78.  The Owens Parcels are located within the Apache-Sitgreaves National Forest and include 118 acres of riparian habitat, including "vital habitat for the federally listed loach minnow, spikedace and the Apache trout."  AR Doc. 332 at 5276, 5281.  Approximately 1.65 miles of the West Fork of the Black River and 1.5 miles of the Blue River flow through the Owens Parcels.  *Id.* at 5277.  If the exchange is completed, the parcels will become part of the national forest.

After issuing notice to the public, conducting various due diligence evaluations including water resources evaluations (AR Docs. 16, 29), a biological assessment and

---

[1] "AR Doc." refers to the Administrative Record in this case.  "Doc." refers to the Court's docket.

evaluation (AR Doc. 76), appraisals (AR Doc. 115, *see* AR Doc. 81), a migratory bird analysis (AR Doc. 88), and an environmental assessment (AR Doc. 92), and reviewing and addressing public comments, the Forest Service decided on August 27, 2004 to proceed with the land exchange.  AR Doc. 130.  The Greer Coalition, the Center for Biological Diversity, and others appealed the decision, resulting in an administrative remand of the BRLE decision.  On remand, the Forest Service prepared, among other documents, a Supplemental Analysis to the Biological Assessment and Evaluation (AR Doc. 168), an assessment of cumulative watershed effects (AR Doc. 175), a Recreation Specialist Report (AR Doc. 180), a Biological Assessment and Evaluation (AR Doc. 185), a Geologic Resources Report (Doc. 200), and an Environmental Assessment (AR Doc. 202).  Public comments were again received and reviewed.  On October 14, 2005, the Forest Service again approved the exchange.  AR Doc. 204. Further administrative appeals followed, and on January 23, 2006, the Department of Agriculture issued a final decision to proceed with the exchange.  AR Doc. 241.

Plaintiffs filed suit in this Court challenging the agency's decision.  In an order that will be referred to as *Greer I*, District Judge Mary Murguia granted summary judgment for Plaintiffs in part and for the Forest Service in part.  *See Greer Coal., Inc. v. U.S. Forest Serv.*, No. CV 06-0368-PHX-MHM, 2007 WL 675954 (D. Ariz. March 1, 2007).  *Greer I* held that the Forest Service violated the National Environmental Policy Act ("NEPA") and the Federal Land Policy and Management Act ("FLPMA") by (1) failing to take a "hard look" at the environmental impact that could result from possible "wildcat development" of the Greer Parcels, (2) failing to prepare an Environmental Impact Statement ("EIS") for the effect of the exchange on the Greer Parcels and surrounding lands, and (3) failing to consider a 1994 land exchange when preparing the appraisal.  2007 WL 675954 at *8, *13.  *Greer I* ruled in favor of the Forest Service on several issues, holding that the agency action was not arbitrary and capricious when it concluded that the exchange was in the public interest, when it declined to impose a deed

restriction that would limit development of the Greer Parcels, and when it relied on Owens's purchases of the Owens Parcels in calculating the market value of the land.[2]  *Id*. at *7, *11.   Judge Murguia remanded the BRLE to the Forest Service for further proceedings.  CV 06-0368-PHX-MHM Doc. 35.

On remand, the Forest Service prepared additional analytical documents, including a Geologic Resources Report and Supplemental Groundwater Assessment (AR Doc. 252), a Geologic Resources Assessment (AR Doc. 279), a Socio-Economic Impact Report (AR Doc. 284), a Draft EIS ("DEIS") (AR Doc. 293), a Final EIS ("FEIS") (AR Doc. 332), appraisals of the Greer and Owens Parcels (AR Docs. 376, 377), a Supplemental Analysis of the Biological Assessment and Evaluation (AR Doc. 322), an Addendum to the Biological Assessment and Evaluation (AR Doc. 324), an Amendment to the Geologic Resources Report (AR Doc. 326), and a Supplemental Analysis of the Biological Evaluation of Sensitive and Management Indicator Species (AR Doc. 327). After reviewing and addressing public comments on some of these documents, the Forest Service issued a Record of Decision ("ROD") on September 15, 2009, that decided to move forward with the land exchange.   AR Doc. 332.   The ROD provided this explanation for approval of the BRLE:

> Multiple benefits would be expected with the addition of the [Owens Parcels] to the [National Forest].  They include acquisition of vital habitat for the federally listed loach minnow, spikedace and the Apache trout; acquisition of aquatic and riparian habitats associated with the mainstream of the West Fork of the Black River and the Blue River; a reduction in complex ownership patterns that would help to block up public land ownership; elimination of numerous miles of landline boundaries and

---

[2]  Plaintiffs pled six claims in *Greer I*: (1) violation of FLPMA for failure to provide an adequate public interest determination; (2) violation of FLPMA for relying on flawed appraisals that undervalued the Greer Parcels and overvalued the Owens Parcels; (3) violation of NEPA for failure to consider foreseeable indirect environmental impacts related to non-regulated, or "wildcat," development; (4) violation of NEPA for failure to consider alternatives such as deed restrictions or purchasing the Owens Parcels outright; (5) violation of NEPA for failing to consider cumulative impacts, including prior transfers to Owens in the Greer area; and (6) violation of NEPA for failure to prepare an Environmental Impact Statement.  No. CV 06-0368-PHX-MHM Doc. 3.

controlling corners that will contribute to management efficiency; and elimination of any possible future subdivision/residential development on these remote private inholdings within the boundaries of the [Apache-Sitgreaves National Forest].  On a forest-wide basis an additional 58.61 acres of land would be available for public recreation use.

The FEIS found that no significant impacts to the following resources would occur:  pristine open space, noise, traffic, commercial development, regulation of water resources, wildlife and wildlife corridors, sewer services, recreational opportunities, fire hazard potential, plants, scenic quality, emergency services, values of adjacent properties, water quality and availability, wetlands and floodplains, plants and wildlife (including threatened, endangered, and sensitive species), land use, public services, property taxes, soil and air, grazing resources, mineral resources, hazardous materials, heritage resources, and caves.

AR Doc. 332 at 5281.

An exchange agreement was executed on September 17, 2009.  AR Doc. 334. Administrative appeals followed, and a final determination was made by the Department of Agriculture on December 16, 2009, to continue with the exchange.  AR Doc. 371. Plaintiffs promptly filed this action.

Before proceeding with analysis of the legal arguments presented by the parties, the Court notes that it understands Plaintiffs' opposition to the BRLE.  Landowners in Greer understandably oppose the loss of Forest Service land in and near the town – land that adds considerably to Greer's unique forest setting and provides a variety of outdoor recreational opportunities.  The question in this case, however, is not whether the land exchange is a good idea.  The question is whether Plaintiffs have carried the considerable burden of showing that the action of a coordinate branch of the Federal government – the Forest Service's decision to approve the BRLE – is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, as required by the APA.

## II.    Waiver of Affirmative Defenses.

Defendants assert three affirmative defenses in their cross-motion for summary judgment: res judicata (Claims 1 and 4), failure to exhaust administrative remedies (Claims 2, 3, and 5),[3] and failure to provide 60 days' notice of the ESA claim in Claim 7. Doc. 48.  Plaintiffs argue that Defendants waived these defenses by failing to assert them in their answer, citing *Morrison v. Mahoney*, 399 F.3d 1042, 1046 (9th Cir. 2005).  *See* Doc. 51 at 3.  Defendants do not directly address the waiver argument other than to assert that it "should be rejected."  *See* Doc. 54 at 3, 4-20.

In *Morrison*, the Ninth Circuit stated that "[u]nder the Federal Rules of Civil Procedure, a party, with limited exceptions, is required to raise every defense in its first responsive pleading, and defenses not so raised are deemed waived."  399 F.3d at 1046. *Morrison*, however, is a habeas case decided under the Antiterrorism and Effective Death Penalty Act ("AEDPA").  It relies upon other AEDPA cases.  Before *Morrison*, in a non-AEDPA case, the Ninth Circuit stated that "[w]e have liberalized the requirement that defendants must raise affirmative defenses in their initial pleadings."  *Magana v. N. Mariana Islands*, 107 F.3d 1436, 1446 (9th Cir. 1997).  The Ninth Circuit held that defendants may raise affirmative defenses for the first time in a motion for summary judgment if the delay does not prejudice the plaintiff.  *Id*. (citing *Rivera v. Anaya*, 726 F.2d 564, 566 (9th Cir. 1984)).  The Ninth Circuit has restated this position in other non-AEDPA cases.  *See*, *e.g.*, *Panaro v. City of N. Las Vegas*, 432 F.3d 949, 952 (9th Cir. 2005) ("a defendant may raise an affirmative defense at the summary judgment stage as long as the plaintiff does not suffer prejudice"); *Paine v. City of Lompoc*, 265 F.3d 975, 981 n.1 (9th Cir. 2001) ("[b]ecause [plaintiff] has not argued that he suffered prejudice due to the defendants' tardy assertion of this defense, the defense is not waived").  In

---

[3] For Claim 2, Defendants argue that Plaintiffs did not administratively appeal the decision of the Forest Service's appraiser.  For Claims 3 and 5, Defendants assert that the key arguments made before this Court were not raised in Plaintiffs' appeal below.  These are analytically-different procedural flaws, but for purposes of this order they will be treated under the broad label of exhaustion.

light of these cases, the Court holds that Defendants may raise affirmative defenses for this first time in their cross-motion for summary judgment if Plaintiffs are not prejudiced.

Defendants filed their answer on March 1, 2010.  Plaintiffs filed their motion for summary judgment three months later, and Defendants filed their cross-motion on October 1, 2010.  Plaintiffs conceded at oral argument that they suffered no prejudice from this delay.  The Court accordingly holds that Defendants have not waived their affirmative defenses.[4]

### III.    Claims 1 and 4 – Res Judicata.

#### A.    Legal Standards.

Res judicata, also known as claim preclusion, applies when there is "(1) an identity of claims, (2) a final judgment on the merits, and (3) privity between parties." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003).  Determining whether there has been an "identity of claims" cannot be made "by mechanistic application of a simple test."  *Costantini v. Trans World Airlines*, 681 F.2d 1199, 1202 n.7 (9th Cir. 1982) (quoting *Abramson v. Univ. of Haw.*, 594 F.2d 202, 206 (9th Cir. 1979)).  Instead, a court should consider four factors: "(1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts."  *Id.* at 1201-02.  The fourth factor is the most important.  *Id.* at 1202.  Res judicata "bars relitigation of all grounds of recovery that were asserted, or could have been asserted, in a previous action between the parties, where the previous action was resolved on the merits."  *Tahoe-Sierra*, 322 F.3d at 1078 (internal quotation marks omitted).

---

[4] Defendants also mention the issue of standing in a footnote of their cross-motion. Doc. 48 at 8 n.1.  Plaintiffs dedicate almost three pages to standing in their response (Doc. 51 at 15-18), but Defendants do not mention it in their reply.  *See* Doc. 54.  The Court concludes that Defendants have not effectively challenged standing in this case, and that Plaintiffs' standing arguments are persuasive in any event.

1

2

**B.      Analysis.**

      **1.      Claim 1 – Public Interest.**

Plaintiffs claim that Defendants' approval of the BRLE violates FLPMA's mandate that the exchange be in the public interest, and is therefore arbitrary, capricious, and contrary to law.  Doc. 1 at 11.  They assert that the agency did not fully consider the needs of state and local residents and failed adequately to analyze factors established pursuant to FLPMA.  *Id.*

Plaintiffs argue that FLPMA, more specifically 43 U.S.C. § 1716(a), requires the Forest Service to "give full consideration to better Federal land management and the needs of State and local people, including needs for lands for the economy, community expansion, recreation areas, food, fiber, minerals, and fish and wildlife," and to find "that the values and the objectives which Federal lands or interests to be conveyed may serve if retained in Federal ownership are not more than the values of the non-Federal lands or interests and the public objectives they could serve if acquired."  Doc. 1 at 8 (citation and emphasis omitted).   The FEIS and the ROD allegedly fall short of this requirement because they: (a) fail to mention that Greer residents are opposed to the land exchange and that the exchange could negatively affect their quality of life; (b) in analyzing protection of fish and wildlife, the FEIS and ROD focus primarily on the benefits gained from acquiring the Owens Parcels and fail to consider the effects of the exchange on habitats in the Greer Parcels; (c) fail adequately to address the impact of the exchange on the local watershed in Greer; (d) fail to address the aesthetic effect of the exchange on the rural character of Greer; and (e) fail to consider the net loss of public recreation space.  Doc. 1 at 9-10; Doc. 41 at 20-25.

Defendants contend that this claim is barred by res judicata because *Greer I* decided the claim in their favor.  Doc. 48 at 17-19.  A comparison of Claim 1 in this case with Claim 1 in *Greer I* shows them to be virtually identical.  *Compare* Doc. 1 at 8-10 *with* CV 06-0368-PHX-MHM Doc. 3 at 7-10.  A few words have been changed to refer

to Defendants' actions on remand, but the claim itself was clearly copied from *Greer I*, a fact confirmed by Plaintiff's counsel at oral argument.

Judge Murguia granted summary judgment in Defendants' favor on Claim 1. *Greer I*, 2007 WL 675954 at *11. Plaintiffs nonetheless argue that the claim may be relitigated in this case because the public interest factors were reconsidered by the Forest Service on remand and, therefore, constitute new agency action that is subject to review. *See* Doc. 51 at 13-15.

Plaintiffs are correct in asserting that the ROD contained a renewed analysis of public interest factors. AR Doc. 332 at 5565-72. Moreover, the ROD had the benefit of the FEIS on which to base a more informed decision. *Id*. The flaw in Plaintiffs' argument, however, is that *Greer I* had already held that Defendants did not act arbitrarily or capriciously when they concluded, even on a more limited record, that the BRLE did not violate the public interest requirement of FLPMA. On remand, the agency reached the same conclusion, on the same parcels of land, for the same exchange. Applying the *Costantini* factors, the Court finds that Claim 1 in this case involves infringement of the same right that was at issue in Claim 1 of *Greer I*, that substantially the same public interest factors and evidence are at issue in both claims, that Defendants' summary judgment determination that the BRLE is in the public interest would be eliminated by relitigation of the claim here, and that the two claims arise out of the same transactional nucleus of facts – Defendants' approval of the BRLE. The Court accordingly finds an identity of claims between Claim 1 in this case and Claim 1 in *Greer I*. *Costantini*, 681 F.2d at 1201-02. Because a final judgment was entered on the claim in *Greer I* and there is privity between the parties, res judicata bars the relitigation of the claim in this case. *Tahoe-Sierra*, 322 F.3d at 1077.[5]

_____

[5] Even if the Court were to consider Claim 1 on the merits, it would enter summary judgment as did Judge Murguia. The Court cannot conclude that Defendants' evaluation of the public interest factors (AR Doc. 332 at 5565-72) was unreasonable or otherwise arbitrary and capricious. *See Greer I*, 2007 WL 675954 at *10-11.

1    **2.    Claim 4 – Cumulative Impact of Owens's Ownership.**

2          Plaintiffs claim that the agency's decision to exchange the Greer Parcels for the

3    Owens Parcels violates regulation 40 C.F.R. § 1508.7, promulgated under NEPA, and is

4    therefore arbitrary, capricious, and contrary to law.  Doc. 1 at 14-15.  Plaintiffs assert that

5    the regulation requires the agency to consider the cumulative impact of its past, current,

6    and reasonably foreseeable future actions.  *Id.*  Plaintiffs argue that the Forest Service

7    failed to consider a prior conveyance of federal land to Owens – land that is adjacent to

8    the Greer Parcels.[6]  *Id.*  The concern is that a single owner will now have 527 acres of

9    prime development land in Greer, a community of approximately 600 property owners.[7]

10   *Id.* at 15.   Subdividing the 500+ acres into one-acre parcels and selling them would

11   almost double the number of property owners in the community.  *Id.*

12         Defendants respond that this claim was decided in their favor in *Greer I*.  Doc. 48

13   at 26-27.   Plaintiffs again argue that res judicata does not bar the claim because new

14   agency action occurred on remand.  *See* Doc. 51 at 13-15.

15         A comparison of Claim 4 in this case and Claim 5 in *Greer I* shows that they are

16   virtually identical.  *Compare* Doc. 1 at 14-15 *with* CV 06-0368-PHX-MHM Doc. 3 at 14-

17   15.  As with Claim 1, some of the words have been changed, but the claim is precisely

18   the same.  Judge Murguia entered judgment in Defendants' favor on Claim 5.  Although

19   her opinion in *Greer I* does not address the claim specifically, her subsequent order

20   expressly entered judgment in favor of Defendants on this claim.  *See* CV 06-0368-PHX-

21   MHM Doc. 35 at 2.   Plaintiffs initially cross-appealed this order (*id.* Doc. 46), but

22   subsequently dismissed their appeal (*id.* Doc. 50).   On remand, Defendants did not

23   address the specific cumulative impact issue raised in *Greer I*.  AR Doc. 332, Appendix

24   _____

25        [6] The prior land transfer conveyed 189 acres to Owens and approximately 20 acres
26   to two other individuals.  Doc. 1 at 15.  The transfer was made from the United States to
     Transamerica Trust No. 84-843, and from the Trust to Owens.

27        [7] In their motion, Plaintiffs also assert that Mr. Owens separately purchased 160
     acres, bringing the total of contiguous land he owns in Greer to over 700 acres.  Doc. 41
28   at 17-18.

B.  Thus, the cumulative impacts analysis challenged in Claim 4 of this case is precisely the same analysis that was at issue in Claim 5 of *Greer I*, no new analysis on the subject having been completed on remand.   There is an identity of claims between the two claims.

In addition to an identity of claims, res judicata requires only a final judgment on the merits and privity between parties.  *Tahoe-Sierra*, 322 F.3d at 1077.  Plaintiffs do not contest the presence of these other two requirements.  Claim 4 is therefore barred by res judicata.[8]

**IV.   Legal Standards for Claims 2, 3, 5, 6, and 7.**

**A.   APA Review.**

The Court may set aside an agency's decision under the APA if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001).  "Agency action should be overturned only when the agency has 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  "This standard of review is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision."  *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (internal quotes and citation omitted).

---

[8]  The Court notes that Defendants did engage in a cumulative impacts analysis in the FEIS.  AR Doc. 332, Appendix B.  That analysis addressed the possible development of the Greer Parcels and found that it would be regulated by a host of federal, state, and local laws.  *Id.*

1   On judicial review, a court must examine the "disputed decision's rationale and

2   surrounding circumstances," *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172,

3   1180 (9th Cir. 2000), but "[t]he court is not empowered to substitute its judgment for that

4   of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416

5   (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  If the

6   agency's decision "is based on a consideration of the relevant factors" and there has not

7   been a clear error of judgment, the court must uphold the decision.  *See Ocean Advocates*

8   *v. U.S. Army Corps of Eng'rs.*, 361 F.3d 1108, 1119 (9th Cir. 2004), *r'vd on other*

9   *grounds*, 402 F.3d 846 (9th Cir. 2005); *see also Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610,

10   626 (1986); *State Farm*, 463 U.S. at 43.

11       **B.    FLPMA.**

12       "FLPMA requires that 'the public lands be managed in a manner that will protect

13   the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric,

14   water resource, and archeological values.'"  *Desert Citizens*, 231 F.3d at 1179.  FLPMA

15   permits challenges "by land users to ensure appropriate federal guardianship of the public

16   lands which they frequent."  *Id.* at 1177.  If public land will be lost to challengers by an

17   exchange, the challengers have a right to "assure that no exchange takes place unless the

18   governing federal statutes and regulations are followed, including the requirement that

19   the land exchanged is properly valued by the agency."  *Id.*  Where an agency does not

20   demonstrate exacting compliance with FLPMA, the error may be deemed harmless if the

21   agency action nonetheless satisfied the purposes of FLPMA.  *See Sagebrush Rebellion,*

22   *Inc. v. Hodel*, 790 F.2d 760, 764 (9th Cir. 1986) ("We agree that the notices did not

23   comply in every respect with the terms of section 204(b).  However, we find the error to

24   be harmless since the purposes of FLPMA's notice requirement were fully satisfied.").

25   Moreover, claims that an agency violated FLPMA are viewed under the discretionary

26   review standard of the APA.  *See Desert Citizens*, 231 F.3d at 1180.

27

28

C.    NEPA.

NEPA's "requirements are procedural." *City of Carmel-By-The-Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1150 (9th Cir. 1997) (citing *Laguna Greenbelt, Inc. v. U.S. Dept. of Transp.*, 42 F.3d 517, 522 n.1 (9th Cir. 1994)).  The statute establishes factors to be considered in agency action, but does not mandate a particular substantive result.  *Id.* (citing *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)).  In reviewing compliance with NEPA, a court will not substitute its judgment for that of the agency "concerning the wisdom or prudence of a proposed action." *Oregon Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987).  Instead, the court will "defer to an agency's decision that is 'fully informed and well-considered,'" so long as the decision does not evince a "clear error of judgment." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998) (citations omitted).  Errors by an agency in observing the mandates of NEPA are not harmless if they "prevent[] a proper, thorough, and public evaluation of the environmental impact of the [p]roject." *See Lands Council v. Powell*, 395 F.3d 1019, 1037 n.25 (9th Cir. 2005).

A key procedural requirement of NEPA is the preparation of an EIS.  *City of Carmel-By-The-Sea*, 123 F.3d at 1150.  In reviewing an EIS, a court applies a "rule of reason" and determines whether the EIS contains "a reasonably thorough discussion of the significant aspects of the probable environmental consequences," *id.* (quoting *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir. 1992)), so as to "foster both informed decision-making and informed public participation," *id*. at 1151 (quoting *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982)).  A court concludes the inquiry once it determines that the agency has taken a "'hard look' at a decision's environmental consequences." *Id*.

An EIS typically involves data and expert opinions of scientists.  When such expert opinions are challenged, NEPA does not require the court to "settle disputes

between scientists, [but rather] dictates that [courts] defer to agency opinion if it is not otherwise shown to be arbitrary or capricious." *Id*. at 1151-52 (citing *Laguna Greenbelt*, 42 F.3d at 526, *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376 (1989) ("Because analysis of the relevant documents 'requires a high level of technical expertise,' we must defer to 'the informed discretion of the responsible federal agencies.'" (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)))).   "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts, even if, as an original matter, a court might find contrary views more persuasive." *Id*. at 388; *see also Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1194 (9th Cir. 2000).

**V.     Claim 2 – Equal Market Value.**

Plaintiffs claim that the Forest Service's decision to exchange the Greer Parcels for the Owens Parcels violates § 206(b) of FLPMA and is therefore arbitrary, capricious, and contrary to law.  Doc. 1 at 11.  Plaintiffs assert that § 206(b) requires the lands involved to either be of equal market value or be equalized through cash payment.  *Id.* Plaintiffs argue that the value of the Greer Parcels far exceeds the value of the Owens Parcels when compared to market data, and that the appraisals relied upon by the Forest Service are flawed.  *Id.*; Doc. 41 at 25-35.  Plaintiffs take issue with specific parts of the appraisals (discussed below), and argue that they result in undervaluing the Greer Parcels and overvaluing the Owens Parcels.  Doc. 41 at 25-35.  Although Defendants' position in their motion to dismiss is procedural – namely that Plaintiffs failed to exhaust this argument – the substantive issues receive meaningful opposition in Defendants' reply. Doc. 54 at 5-19.  Because Plaintiffs were permitted to file a sur-reply (Doc. 64), the Court may consider substantive arguments raised by Defendants for the first time in their reply. The Court will address each of Plaintiffs' arguments in turn.

**A.      Exhaustion.**

Defendants' cross-motion argues that Plaintiffs failed to exhaust this claim by failing to administratively appeal the appraisals. Doc. 48 at 22. Defendants assert that exhaustion is required by the Department of Agriculture Reorganization Act of 1994, 7 U.S.C. § 6912(e) ("DARA"). Doc. 51. The exhaustion requirement of DARA, however, is not jurisdictional. *McBride Cotton & Cattle Corp. v. Veneman*, 290 F.3d 973, 976 (9th Cir. 2002). Because the Court concludes below that Plaintiffs' substantive appraisal arguments are not sufficient to set aside the BRLE, the Court need not consider the parties' arguments on whether appeal of the appraisals was possible and, if so, whether the Court should invoke a non-jurisdictional exhaustion requirement.

**B.      Alleged Overvaluation of the Owens Parcels.**

The appraisals found the combined value of the Greer Parcels to be $8,164,000 and the combined value of the Owens Parcels to be $8,002,000. Doc. 54 at 18. Defendants state that the $162,000 difference will be paid in cash by Owens, as permitted by FLPMA.

Plaintiffs argue that the appraisal of the Owens Parcels is deficient because it relies almost entirely on prices Owens himself paid for the Owens Parcels with an eye to exchanging the property, in contravention of guidance in the Uniform Appraisal Standards for Federal Land Acquisitions that the best evidence of market value is "arms length transactions." Doc. 41 at 26-29. Defendants contend that Plaintiffs have produced no evidence that Owens's purchases of the land were not arms' length transactions. Doc. 54 at 13-16. Defendants further argue that other transactions which Plaintiffs accepted as arms'-length actually have a price per acre that is close to that of the Owens parcels. *Id.*

This issue was decided in *Greer I*. Plaintiffs argued in *Greer I* that the valuation of the Owens Parcels "is flawed as the data used was a product of transactions that were not conducted at arms-length." 2007 WL 675954, at *11. Judge Murguia disagreed: "the Court does not find merit in Plaintiffs' argument that the valuation of the [Owens Parcels]

was tainted by the appraiser's citation and reliance upon previous transactions involving the private landowner, Mr. Owens, based upon the possibility that such transactions were not conducted at arms-length." *Id.*

The doctrine of collateral estoppel, or issue preclusion, precludes re-litigation of an issue when (1) the issue of law or fact (2) was actually litigated (3) in a previous suit between the parties and (4) the issue was necessarily decided as part of the judgment. *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 887 (9th Cir. 2000).   The first three elements of collateral estoppel clearly are satisfied here, and the Court concludes that the fourth requirement is satisfied because Judge Murguia decided the issue as part of her summary judgment ruling on Plaintiffs' appraisal arguments.  2007 WL 675954, at *11-12.   Courts may raise collateral estoppel sua sponte to avoid inconsistent results and preserve judicial economy.  *Clements v. Airport Authority of Washoe County*, 69 F.3d 321, 328-30 (9th Cir. 1995).  Because Plaintiffs' argument about reliance on the previous Owens transactions was previously litigated between the parties and decided by Judge Murguia in Defendants' favor, the Court will invoke collateral estoppel and not address it again.

## C.     Reliability.

Plaintiffs argue that both appraisals are unreliable because their 12-month shelf-life expired before the binding exchange agreement was signed, a fact that should have triggered reappraisals.   Doc. 41 at 33.   The effective date of the appraisals was September 19, 2008.  Defendants assert that the United States and First American Title Insurance Company executed the exchange agreement on September 17, 2009, within the 12-month life of the appraisals, a fact confirmed by the record.  AR Doc. 334.

Plaintiffs also argue that the appraisals do not take into account reduced real estate valuations following the recent recession.  Doc. 41 at 33.  Defendants argue that market conditions were not more favorable in 2008 than 2009.  In fact, they argue that 2009 saw an uptick in Arizona real estate values and therefore the effects of the real estate market

recession are not relevant.  Doc. 54 at 17-18.  Defendants do not address market value between 2006 and 2008, other than to argue that Plaintiffs have misread the record when they assert that the agency relied on appraised values from 2006.  *Id.*

The date of valuation for the Greer Parcels is shown in the appraisals as September 19, 2008.    AR Doc. 376 at 5901.  The appraisals' upward valuation adjustments were applied, however, only through April of 2006.  The appraisals provide this explanation of market conditions and the basis for the adjustment decisions:

> **Market Conditions:**  Any change in land values between the date of sale and the date of value must be adjusted for the analysis, in order to analyze the sales as though they occurred in the same financial environment that prevailed on the date of value.  Beginning prior to 2000 and continuing into 2006, the rural land market in Arizona and in Apache County experienced a price escalation, with land increasing at a very rapid pace beginning in 2004.  By 2006, the upward spiral had ended, and prices have remained level or declined in most non-urban areas.  The market began to cool in 2005 and came to a near standstill in the Spring of 2006.  Since then, buyers have taken a cautionary stance, delaying purchase decisions to see whether prices decline.
>
> During 2007 and 2008 there has been a continued slowdown in land sales in Apache County, as in most of Arizona, due to the turmoil in the mortgage industry and financial markets.  This reversal in the residential real estate market, which followed a decade of upward movement and sales and prices, has had an effect on demand and prices in other property types as well as residential sales.  Buyers are now cautious and many have adopted a waiting posture to see if prices will decline, creating a freeze in the market.
>
> Brokers in Greer state that land prices have been flat since the peak in 2006, but that prices of improved residential properties have declined 15% to 20%.  This perception is not based on actual sales, but rather from active listing prices – that is, some sellers of homes have reduced their asking prices by 20%, but owners of land have not made price reductions....
>
> There are no recent sales and resales of tracts the size of the subject parcel from which to develop a market conditions adjustment.  There is no evidence that prices of large tracts continued to climb beyond Spring 2006, when purchasers began to exercise caution and sales slowed.  Therefore,

1   only Sales 1 through 5 require a market conditions adjustment, and the
2   adjustment is made only through April 2006.

3   AR Doc. 376 at 5952, 5955.  *See also* AR Doc. 376 at 5940 (recognizing the "national
4   recession and an about-face in the residential real estate market" that have "had an effect
5   on the rural residential land market in Arizona").

6          As this explanation makes clear, the upward adjustments of comparable land sales
7   was extended only to the Spring of 2006 because prices peaked at that time.   The
8   appraisals did not disregard market conditions in 2007 and 2008 as Plaintiffs claim.  The
9   appraisals found that the market for large real estate parcels in Apache County was flat in
10  those years, suggesting that no downward adjustment of values was warranted despite the
11  difficult economic conditions produced by the mortgage crisis.  The appraisals did not
12  address market conditions in 2009 because they were completed on September 19, 2008,
13  and the BRLE was executed within their one-year shelf life.

14         The Court cannot conclude that the appraisals' treatment of the years 2007-2008
15  renders them arbitrary and capricious or not in accordance with law, nor can the Court
16  conclude that Defendants acted unreasonably when they consummated the BRLE within
17  the appraisals' shelf life.  As noted above, courts should not overturn agency decisions
18  when the agency has considered relevant factors and reached a rational conclusion.
19  *Marsh*, 490 U.S. at 378.  This is particularly true where, as in the case of these appraisals,
20  the agency chooses to rely on the opinions of qualified experts.  *Id.*

21         **D.      Remaining Challenges to the Greer Parcels Appraisal.**

22         Plaintiffs identify several specific flaws in the appraisal of the Greer Parcels.
23  Because the Court must determine whether Defendants' reliance on the appraisal was
24  arbitrary and capricious, the Court will provide an overview of the appraisal before
25  addressing Plaintiffs' specific complaints.

26         The 211-page appraisal for the Greer Parcels valued Tracts A and B as of
27  September 19, 2008, although the date of the actual appraisal report is October 10, 2008.
28  AR Doc. 376 at 5901.  The appraisal states that it complies with the Uniform Standards

of Professional Appraisal Practice ("USPAP"), the Uniform Appraisal Standards for Federal Land Acquisitions ("UAS"), and the Code of Federal Regulations, 36 C.F.R. Part 254, Land Ownership Adjustments.  AR Doc. 376 at 5902.  The appraisal defines market value by quoting from 36 C.F.R. § 254.2:  "the most probable price in cash, or terms equivalent to cash, which lands or interest in lands should bring in a competitive and open market under all conditions requisite to a fair sale, where the buyer and seller each acts prudently and knowledgeably, and the price is not affected by undue influence."  AR Doc. 376 at 5904.  The appraisal also assumes as a hypothetical condition that "the lands and interests are already in private ownership, zoned consistent with similar non-Federal properties in the area, and are available for sale on the open market."  *Id.* at 5905.  This assumption was made pursuant to the Forest Service's instruction that the appraisal should comply with 36 C.F.R. § 254 (Subpart A).  AR Doc. 286 at 4382.  The appraisal applies the four criteria for "highest and best use" set forth in the UAS, a requirement of section 206(f)(2) of FLPMA as recognized by the Ninth Circuit.  *See Desert Citizens*, 231 F.3d at 1181; AR Doc. 376 at 5936.

The appraisal determined that the highest and best use of the Greer Parcels was "for investment . . . [with] [a]n interim use [of] continued grazing."  AR Doc. 376 at 5942.  This conclusion was based on the current economic downturn and its chilling effect on real estate development.  The appraisal noted that, despite the traditionally high demand for property in Greer, development in the area had virtually ceased, no new residential developments were proceeding through Apache County Planning and Zoning, and there were more vacant and improved residential lots on the market in the Greer area than at any time in the last 20 years.  *Id.* at 5941.  As a result, current development of the Greer Parcels was deemed as a non-feasible alternative, and the present highest and best use was determined to be holding the land for investment "until the residential market recovers and financing is again available for residential development projects."  *Id.* at 5942.

The uncertainty in the market prompted the appraiser to consider using the income approach to valuation, but ultimately the sales approach was deemed most suitable. *Id.* at 5940-41. The appraiser looked primarily at sales "within the past 3 to 5 years." *Id*. The focus was on "vacant land sales within the Apache-Sitgreaves National Forests." *Id*. While sales in the immediate Greer area since 2003 were few, the appraiser found "a sufficient number of sales since 2005 to provide an adequate analysis of the current market value, eliminating the need to rely on the older sales." *Id.* at 5908. The appraiser considered two prior appraisals for the Greer Parcels, but did not include the sales from those documents because of the age of the market data. *Id.* (also noting that "changes in market conditions since the 1992 and 2003 appraisals were prepared reduce their reliability in an estimate of current market value").

The sales considered by the appraiser included two properties near Greer: Sale 4 and Sale 7. *Id.* at 5946. The appraiser acknowledged that although Sale 4 was, at 9.5 acres, much smaller than the Greer Parcels, it was "included because it is one of very few sales in the Greer area that has occurred in the past five years." *Id.* at 5948. Sale 7 involved a 17.07-acre parcel, was "fairly recent," and "was purchased to divide and resell as . . . one-acre lots or five-acre lots." *Id.* at 5949. The appraisal also notes that a third sale, Sale 15, occurred in Greer since June 2005, but the sale was deemed not relevant because, at three acres, it was too small. *Id.* at 5955. These were the only three sales in Greer for lots greater than one acre after June 2005. *Id.*

The rationale provided by the appraiser for expanding the search for comparable sales beyond Greer was the paucity of sales in the area. *Id.* at 5955. The appraiser acknowledged that sales outside of Greer required a location adjustment. *Id.* at 5956. The method used to derive the location adjustment for sales in the town of Show Low was to compare one-acre lot sale prices in Show Low with one-acre lot sales in Greer. *Id.*[9] *Id.* The appraisal found that post-2006 one-acre lot sales in Greer ranged from

---

[9] The appraisal expressly stated that it did not consider the Hidden Meadows

$170,000 to $284,000 per acre.  *Id.*   Price ranges per acre for two Show Low communities ranged from $146,914 to $236,111 in the Torreon community, and $76,786 to $114,785 in Cheney Ranch.  *Id.*   The average Show Low price per acre across 11 transactions in these two communities was $168,380.  *Id.*   Compared with the average Greer one-acre lot price of $210,000, the location adjustment was calculated at 25%.  *Id.*

The appraisal also applied a property appreciation adjustment.  For sales 1 through 5, which occurred between May 2005 and July 2005, the appraiser applied a 15% upward adjustment compounded annually through April 2006 when prices plateaued.  *Id.* at 5946, 5955.  No adjustment was applied to sales 6 through 8 because they occurred after the price-leveling date.  *See id.* at 5955.

Another adjustment made by the appraiser was for lot size in each sale.  *Id.* at 5959.  She concluded, based on sales data, that smaller parcels command higher prices per acre than large parcels.  *Id.*  Sales 4 and 7 were, therefore, downgraded for size.  *Id.* Sale 7 was further adjusted downward due to its well and sewer connection, which the Greer Parcels did not have.  Both sales were also adjusted upward, however, due to access, presence on the floodplain, and inferior scenic appeal.  *Id.* at 5959-60; *see also id.* at 5961.

Following these and other adjustments, the appraiser concluded that Sales 1, 2, 3, 6, and 8 were most similar to the land in Tract A of the Greer Parcels, with Sales 1, 2, and 3 entitled to the greatest weight.  *Id.* at 5962-62.  The appraiser based this decision on the fact that these sales required the fewest adjustments to become comparable to the Tract A property.  *Id.*  Sale 7, although located in Greer, was excluded because of a discrepancy between the buyer's and the seller's perception of value: the seller considered the price above market and the purchaser felt that it was well below market value.  *See id.* at 5968-60.  Sale 4, also located in Greer, was excluded because its acreage, at 9.5 acres, was too

---

development with high-end lots.  AR Doc. 376 at 5956.  *Greer I* found that the appraiser's decision not to use the Hidden Meadows information was not an abuse of discretion.  2007 WL 675954 at *11.

small.  *Id.* at 5962, 5964.  Having thus identified the most relevant sales, the appraiser concluded that the value of Tract A of the Greer Parcels was $25,000 per acre, resulting in a total valuation of $1,750,000.  *Id.* at 5963.

With respect to the valuation of Tract B, the appraiser found Sales 1, 2, and 3 to be most relevant, with Sales 1 and 3 entitled to the greatest weight.  *Id.* at 5968.  This again was due to the fact that these sales required the fewest adjustments to be rendered comparable to Tract B.  *Id.* at 5967.  Having identified the most relevant comparable sales, the appraiser concluded that the value of Tract B was $24,000 per acre, for a total value of $6,414,000.  *Id.* at 5968.

This greatly abbreviated summary of the 211-page appraisal report demonstrates that much judgment is required in valuing real estate, particularly large, undeveloped, rural parcels in a difficult economy.  The appraiser who performed the analysis, Lynn Fowler, MAI, is a member of the Appraisal Institute and the American Society of Farm Managers and Rural Appraisers.  *Id.* at 6103.  She has more than 25 years of experience in appraising, including service as the Chief Appraiser for the Pima County Department of Transportation.  *Id.*  She has a college degree and some graduate education, and has completed courses in Real Estate Appraisal Principles, Basic Valuation Procedures, Capitalization Theories and Techniques, Case Studies in Real Estate Valuation, Valuation Analysis and Report Writing, Standards of Professional Practice, Litigation Valuation, Advanced Rural Appraisal, Advanced Resource Appraisal, Advance Appraisal Review, and Federal Land Exchanges and Acquisitions.  *Id.*  She has been qualified as an expert witness in federal and state courts.  *Id.*

The appraisal was evaluated in a 20-page technical review report prepared by Tate W. Curtis, RPRA, Senior Review Appraiser for the U.S. Forest Service.  *Id.* at 5868-5889.  Mr. Curtis found that the appraisal was logical, adequately documented, and set forth "market evidence to support the conclusions of value."  *Id.* at 5887.  He further concluded:

1
2
3
4
5
6

> The appraisals were prepared in compliance with 1) 36 CFR 254, Subpart A, 2) the 2008-2009 edition of the *Uniform Standards of Professional Appraisal Practice*, 3) the 2000 edition of the *Uniform Appraisal Standards for Federal Land Acquisitions*, and 4) USDA Forest Service instructions written specifically for the assignment.  The five appraisals, which conveyed Market Value as of September 19, 2008 that are summarized on page 1 of this review report, support the value conclusions.  **I approve the appraisal reports and their corresponding value conclusions for Agency use in the proposed land exchange**.

7   *Id.* at 5887 (emphasis in original).

8   Plaintiffs identify two specific flaws in the appraisal that, they claim, render the
9   valuation of the Greer Parcels inaccurate and Defendants' reliance on it arbitrary and
10   capricious.

11   First, Plaintiffs contend that the appraisal uses too few transactions in the Greer
12   area and erroneously looks to transactions from surrounding cities and towns such as
13   Show Low.  Plaintiffs complain particularly that the appraisal considered only two Greer-
14   area sales – Sales 4 and 7 discussed above – and then eliminated those sales in the final
15   analysis.  Plaintiffs also argue that the appraisal failed to use the 2003 sale of an 8.16-acre
16   parcel of land adjacent to the Greer Parcels as a comparable sale.

17   It is true that the appraisal narrowed the field of relevant transactions to eight, only
18   two of which were actually located in Greer.  *Id.* at 5961.  As explained in the appraisal,
19   this was due in large measure to the paucity of sales in Greer, particularly of sizeable
20   tracts of land.  As also explained above, Sales 4 and 7 ultimately were eliminated from
21   the valuation because Sale 4, at 9.5 acres, was too small when compared to the 69.95
22   acres of Tract A and the 267.25 acres of Tract B.  Sale 7 was eliminated because even the
23   parties to that transaction could not agree on whether it constituted an accurate reflection
24   of market value.

25   Although the appraisal report makes no mention of the March 2003 sale of 8.16-
26   acres, it does explain that it looked primarily for transactions within 3 to 5 years of the
27   September 2008 valuation date.  The 2003 sale was before this period.  Moreover, the
28   2003 sale was for even fewer acres than Sale 4, and likely would have been excluded for

the same reason as Sale 4 even if it had not been considered too old.

The Court cannot conclude that the appraisal is fatally flawed because it eliminated Sales 4 and 7 in the ultimate valuation or failed to include the 2003 sale of 8.16 acres. The appraisal considered comparable, size-appropriate, and recent sales, and provided a rational explanation why. *Id.* at 5955-5968.

Plaintiffs' second complaint is that the appraisal applies too small of an upward adjustment when comparing non-Greer land sales to sales in Greer. The appraiser increased the non-Greer prices by 25% to account for the higher land values in Greer. Plaintiffs argue that the adjustment should have been closer to 100%. In making this argument, Plaintiffs discuss properties in Greer and Show Low, arguing that the appraiser used premium properties in Show Low and mediocre properties in Greer, but they support this argument by citing only to the appraisal and to a non-record website for one of the Show Low properties. *See* Doc. 41 at 31, Doc. 31 at 22-23 (¶¶ 135-138), Doc. 64 at 8. Although they do not cite it directly in support of this argument, Plaintiffs elsewhere make reference to a July 2003 letter written by Mr. Edwin L. Biggers to the Forest Service concerning the Greer Parcel valuation. *See* Doc. 64 at 8 (citing AR Doc. 372). The letter discusses several sales transactions in and around Greer, and generally argues for a higher value for the Greer Parcels than what the Forest Service was then considering. AR Doc. 372. Mr. Biggers does not purport to be an appraiser. *Id.*

As noted above, courts must presume an agency's action to be valid and apply the highly deferential standard of the APA. *Nw. Ecosystem Alliance*, 475 F.3d at 1140. Doing so in this case, the Court cannot conclude that the Forest Service's decision to accept the appraisal of the Greer Parcels "'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [made a decision that] is so implausible . . . it could not be ascribed to a difference in view or the product of agency expertise.'" *Pac. Coast Fed'n*, 265 F.3d at

1034  (quoting *State Farm*, 463 U.S. at 43).

Plaintiffs argue that the certain aspects of the appraisals run counter to evidence presented by Mr. Biggers and others.  The Court does not doubt the sincerity of Plaintiffs' or Mr. Biggers' arguments, but even if Plaintiffs and Mr. Biggers were deemed to be appraisal experts comparable in knowledge and experience to Ms. Fowler and Mr. Tate, the Court would be confronted with a conflict between experts.  The Supreme Court has instructed that such a conflict provides no basis for setting aside agency actions under the APA:  "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinion of its own qualified experts, even if, as an original matter, a court might find contrary views more persuasive."  *Marsh*, 490 U.S. at 378.  In this case, where the appraisal evidence presented by Plaintiffs comes from individuals who are not experts, deference to the agency's decision is even more warranted.

**VI.     Claims 3, 5, 6, and 7 – Hydrological and Environmental Effects.**

      **A.     Claim 3.**

Plaintiffs claim that the agency's decision to exchange the Greer Parcels for the Owens Parcels violates regulation 40 C.F.R. § 1508.8(b), promulgated under NEPA, and is therefore arbitrary, capricious, and contrary to law.  Doc. 1 at 12-13.  Plaintiffs argue that, in deciding whether to exchange land, the regulation requires the agency to consider indirect environmental effects of the exchange that are foreseeable.  *Id.*; Doc. 41 at 15-16.  Although the agency considered foreseeable planned development, it allegedly failed to consider "wildcat development" in which undeveloped parcels are sold and developed separately.  Doc. 41 at 15-16.  In a planned-development scenario, natural resources such as water are optimized (such as a single deep well for the entire development project).  In a "wildcat" scenario, resources are not optimized (such as multiple shallow wells, one per parcel, or minimally-shared wells).

*Greer I* ordered the Forest Service to evaluate wildcat development of the Greer Parcels.  2007 WL 675954 at *3.  The agency did evaluate wildcat development on

remand as directed, but Plaintiffs complain that it again failed adequately to assess environmental impacts.  Specifically, Plaintiffs allege that the Forest Service "based its analysis on historic growth rates over a thirty nine year period and a subdivision in Eager, Arizona that is inconsistent with development norms in Greer, and ignored more relevant data that were available."[10]  Doc. 41 at 16.  In making this argument, Plaintiffs cite to the DEIS, not the FEIS.  *See* Doc. 41 ¶¶ 51-54.  The Court will therefore focus on the DEIS for this portion of its analysis.[11]

The DEIS assumed that Owens would not develop the Greer Parcels after the exchange was completed.  This assumption was based on Owens's stated intent as well as his failure to develop substantial tracts of land he has owned in Greer since 1993.  AR Doc. 293 at 4445; AR Doc. 332 at 5433.  The DEIS also evaluated the potential effects of the BRLE using two other scenarios.  One scenario assumed that the Greer Parcels would be developed through lot splits rather than through a master-planned subdivision.  AR Doc. 293 at 4446.  The other scenario assumed subdivision of the property.  *Id*. at 4473.  The DEIS found the likely development rate for these two scenarios to be the same.  *Id.*

Although their argument is not entirely clear, Plaintiffs appear to take issue with the projected development rate through lots splits rather than through subdivision of the Greer Parcels.[12]  The Forest Service provided this explanation for the lot splits projection:

---

[10] Plaintiffs also challenge the agency's assumption that foreseeable development would comply with state and local multi-development regulations.  Doc. 41 at 16.  *Greer I*, however, did not consider such assumptions arbitrary and capricious, *see* 2007 WL 675954 at *4 ("as a general matter, the Forest Service did not act in an 'arbitrary and capricious' manner by forecasting the impact of development of the federal land with the aid of local and state regulations"), and neither does this Court.

[11] The FEIS follows essentially the same analysis.  *See* AR Doc. 332.

[12] Some confusion arises because Plaintiffs contend that the lot splits projection arose from consideration of a subdivision in Eager, Arizona.  Doc. 41 at 16.  The Eager comparison, however, was used for the subdivision comparison.  *See* AR Doc. 293 at 4473.  Crosby Acres, a parcel of property adjacent to Tract B of the Greer Parcels, was used for the lot splits projection.  *Id*. at 4446.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

> If a change in ownership of the [Greer Parcels] were to occur, the following is a possible development scenario and possible associated effects. This development scenario assumes lot splits in accordance with current Apache County zoning regulations. The Crosby Acres subdivision lies adjacent to Tract B and provides an historical basis for rate of development that could be expected. Information received from Apache County Planning and Zoning (P&Z) indicates construction of sixty-eight single-family residences, 6 log homes, and 1 RV Park in Crosby Acres between 1965 and 2005. This represents construction on an average of slightly fewer than 2 lots per year over 39 years. P&Z parcel records do not indicate construction of single-family residences, log homes, RV parks, or commercial development on lots within the Crosby Acres in 2005-2007. Based on the historical average of annual new development subject to Apache County Zoning Regulations, new construction could be projected to occur on approximately 30 lots over the next 15 years. If the rate of future development were to vary by 30%, new construction would occur on between 25-35 lots in Tracts A and B in the 15 years following conveyance. Proportionally this equates to an estimated 5-7 lots on Tract A and 20-28 lots on Tract B. Based on historical development, one could expect that new residential construction would predominate with perhaps one or two new commercial enterprises developed along State Route 373. Parcel records within the Greer Phase I boundary indicate 14% of the property owners with a mailing address in Greer. This is indicative of the seasonal nature of occupancy within the area.

17

AR Doc. 293 at 4446.

18
19
20
21
22
23
24
25
26
27
28

This explanation shows that the agency looked to development of an adjacent property through lots splits rather than subdivision, calculated the rate at which the property had developed, and considered up to a 30% variance from the observed rate. The agency also took into account the generally seasonal nature of residents in Greer. In the pages of the DEIS that follow, the Forest Service applied the predicted rate of development when evaluating noise, traffic, water quality, effects on the Little Colorado River, commercial development, water availability, impacts on wildlife and wildlife corridors, sewer services, recreational opportunities, fire hazards, impacts on plants, scenic quality, emergency services, values of adjacent properties, wetlands and floodplains, and similar considerations. *Id.* at 4446-4498.

In arguing that Defendants' projected rate of lot split development is too low, Plaintiffs cite to comments made by various residents of Greer, none of whom purports to be an expert.  *See* Doc. 31 ¶ 52; AR Doc. 332 at 5410-11, 5431-32, 5433-34, 5499.  Some of these residents identify development activities in the Greer area that can be used to calculate a faster growth rate than Defendants' projections.  Defendants addressed the comments of the residents in the FEIS, noting, among other things, that the lot split growth rate was calculated from a parcel directly adjacent to the Greer Parcels, that a 39-year data period would reflect variations in market conditions,[13] that Owens has not developed property he acquired in the Greer area in 1993 and has stated that he does not intend to develop the Greer Parcels acquired in the BRLE, and that significant impacts would not be expected even if a faster growth rate was assumed, particularly in light of the fact that 86% of any developed properties would be used only seasonally.  AR Doc. 332 at 5410-11, 5431-32, 5433-34, 5499.

As with the appraisal challenges discussed above, Plaintiffs present the good faith views of Greer residents on likely rates of growth and argue that Defendants acted improperly by adopting a different point of view.  Because it is clear that the Forest Service considered relevant facts and articulated rational grounds for its decision, however, the Court cannot set aside the decision under the APA.  *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *Desert Citizens*, 231 F.3d at 1180.

**B.    Claim 5.**

Plaintiffs claim that Defendants have failed to adequately consider the foreseeable impacts that development of the Greer Parcels would have on local groundwater, as required by NEPA.  Doc. 1 at 15-17.  In *Greer I*, the Court found that the agency's hydrological assessments of a wildcat development scenario were not credible, and

---

[13]    The relevance of such variations is illustrated by the dramatic slowdown in Greer-area development brought on by recent economic conditions, as described in the appraisal report.  AR Doc. 376 at 5941.

1    ordered the agency to try again.  2007 WL 675954 at *5.

2         Plaintiffs argue that the Forest Service's groundwater analysis on remand was

3    seriously deficient.  Plaintiffs observe that these deficiencies would have been discovered

4    and addressed much more quickly had the agency subjected the Amendment to the

5    Geologic Resources Report (the "Supplemental Report") (AR Doc. 326) to public

6    scrutiny through the preparation of a Supplemental EIS ("SEIS") subject to notice and

7    comment.

8         Defendants argue that a SEIS was not required by law and that the argument that it

9    should have been published was not exhausted.  Doc. 48 at 23-25.  During oral argument,

10   Plaintiffs conceded that there is no regulation that requires publishing the Supplemental

11   Report as if it were a SEIS.  Plaintiffs' only support for a publication requirement is the

12   general deliberative purpose of NEPA, which is simply too thin a reed on which to find

13   that the agency acted arbitrarily and capriciously.

14        The Supplemental Report was prepared by Dr. Roger Congdon on August 18,

15   2009.  AR Doc. 326 at 5209.  The stated purpose was to "refine the conclusions and

16   findings of the Supplemental Ground Water Assessment of August 29, 2007."  *Id.*  More

17   specifically, it was prepared to answer criticisms that the groundwater modeling exercise

18   in the DEIS suffered from a lack of data.  *Id.*

19        To acquire data on the characteristics of the aquifer and possible effects of

20   pumping from numerous shallow groundwater wells (part of Plaintiffs' postulated wildcat

21   development), the Forest Service retained a New Mexico hydrogeologic firm to perform

22   repeated slug tests on three groundwater wells in the vicinity of the Greer Parcels.  The

23   Supplemental Report averages the hydraulic conductivity values obtained from slug tests

24   on the Squirrel Spring well and the Owens well.  *Id.* at 5209.  The Supplemental Report

25   discards the data from the Iverson well because the well recovered too quickly to obtain

26   an accurate reading.  *Id.*  The Supplemental Report notes, however, that the quick

27   recovery of the well reflected a high hydraulic conductivity, likely around 25 to 30 feet

28

per day. *Id.* Had this well been included, the average used for the Supplemental Report would have been higher than the 13.4 feet per day average of the Squirrel Spring and Owens wells – a result that would have reduced the prospective effects of development on the water supply.

The Supplemental Report recognizes slug tests and pump tests as two types of hydrological tests, and that "storage characteristics of the aquifer are not obtainable from slug tests." *Id.* at 5210. Because storage capacities were not obtained from the tests, Dr. Congdon looked to published reports that cited specific yield characteristics of volcanic aquifers and chose a conservative value for his analysis. *Id.* Plaintiffs do not criticize his choice of this value.

The Supplemental Report analysis was conservative in other respects. Its estimate for surface recharge of water – water that replenishes the aquifer and thereby reduces the effect of pumping wells on the aquifer – was less than 2.5% of the average annual precipitation in the Greer area. *Id.* at 5211. It also assumed the development of 258 homes on the Greer Parcels, and assumed that all of them would pump water from wells in the shallow aquifer as opposed to deeper wells developed for the residential area. *Id.* Numeric modeling using well accepted groundwater models produced little drawdown in the aquifer and an effect on the Little Colorado River of between 0.08% and 0.64%. *Id.* at 5214.

The Supplemental Report's conclusions formed much of the basis for the ROD's discussion of the water supply. The ROD acknowledges the analysis of Dr. Congdon, and recognizes that slug tests were performed and also that aquifer storage parameters were kept "on the conservative side to keep the model somewhat pessimistic." AR Doc. 332 at 5573. The ROD concludes, based on the Supplemental Report, that water use from the possible wildcat development would represent 0.20% of the average flow of the Little Colorado. *Id.* at 5574.

Plaintiffs level several criticisms at the Supplemental Report. Doc. 41 at 9-15.

They note that slug tests were used instead of more complex and more informative pump tests.  They complain that the slug tests were performed on three wells, that one of the three was disregarded as unreliable, and that the other two were simply averaged despite their very different conductivity results.[14]  They argue that the groundwater model assumed houses on the Greer Parcels would be connected to septic tanks, resulting in recharge to the aquifer, despite laws requiring new houses to be connected to sewers.

Plaintiffs' complaint that slug-test results from two wells were averaged disregards the fact that the third well recovered too quickly, reflecting a higher level of conductivity that would have increased the average of the other two wells had it been accurately measured and included.  A higher average would have reduced the effect of pumping in the groundwater model.  Plaintiffs cite a 2008 letter from Dr. Thomas Maddock, a hydrology professor at the University of Arizona, written before the slug tests were performed in July of 2009.  Doc. 41 at 10; AR Doc. 298 at 4576-77.  Dr. Maddock suggested then that "some simple testing to more realistically evaluate [the] impact [on the aquifer] should be done."  AR Doc. 298 at 4577.  Plaintiffs do not explain why the slug tests do not constitute the kind of "simple testing" Dr. Maddock suggested.  Later, after Defendants had performed the slug tests and developed a model based on their results, Dr. Maddock argued that Defendants should have conducted "extended pumping or drawdown tests from a number of wells in the Crosby Acres development."  AR Doc. 356 at 5671.  Dr. Maddock includes other conclusory criticisms in his one-page, five-paragraph critique of Dr. Congdon's analysis.  *Id.*  His and Dr. Congdon's positions represent a conflict among experts that cannot form the basis for the Court's rejection of an agency's decision under the APA.  *Marsh*, 490 U.S. at 378.

It is true that Dr. Congdon's analysis assumed some recharge from septic systems, but his analysis also greatly understated the amount of surface recharge from rain and

---

[14] One well had a hydraulic connectivity of 24.6 ± 1.5 ft./day, whereas the second well had a connectivity of 2.2 ± 0.4 ft./day.  Doc. 41 at 12.

snow, using values less than 2.5% of the average annual precipitation in Greer. Plaintiffs make no attempt to evaluate how the allegedly improper septic recharge compares to the amount of natural recharge known to exist but conservatively not included in the model. Even if it was error to include the septic recharge, it is entirely possible that the missing surface recharge would have more than compensated for the error. Plaintiffs do not address this possibility. Moreover, Plaintiffs do not explain how their septic-tank argument – which assumes that residents of the Greer Parcels will comply with local laws and connect to sewers – comports with their general thesis that the Greer Parcels will be developed through a wildcat scenario that disregards local and state laws and results in hundreds of shallow groundwater wells.[15]

In summary, Plaintiffs have failed to undermine the reasonableness of Defendants' reliance on the analysis of Dr. Congdon. That analysis was intentionally conservative, overstating the groundwater effect of hypothetical wildcat development on the Greer Parcels. AR Doc. 326 at 5214. Defendants considered relevant factors and provided rational reasons for their conclusions. The Court therefore cannot set aside their decision as arbitrary and capricious. *Baltimore Gas & Elec. Co.*, 462 U.S. at 105. This is particularly true where the agency has relied on experts such as Dr. Congdon. *Marsh*, 490 U.S. at 378.

## C.    Claim 6.

Plaintiffs devote only two paragraphs of their summary judgment motion to this claim, and no portion of their other briefs to it. Doc. 41 at 18-19. Plaintiffs agree that "[i]n the FEIS the Forest Service purported to consider the impact that the groundwater pumping from reasonably foreseeable development would have on the nearby riparian

---

[15]    Plaintiffs cannot have it both ways. They cannot assume that future home builders on the Greer Parcels will disregard the laws and install hundreds of unauthorized groundwater wells, and yet also assume that those same wildcat builders will responsibly install a sewer system and connect their homes to it. If it is assumed that these hypothetical builders will follow the law on sewer connections, it should also be assumed they will follow the law and develop one or a few deep groundwater wells or connect to other city sources of water.

1  areas and the local watershed.  FEIS p. 35, 53-4, AR Doc. 332, p. 005327, 005345-6."

2  Doc. 31, ¶ 78.  Plaintiffs argue, however, that Defendants' analysis of this issue is flawed

3  because it relies on Dr. Congdon's Supplemental Report.  Doc. 41 at 19.  Plaintiffs assert

4  that Defendants' analysis of riparian areas would produce a different result if the "flaws

5  in the Supplemental Report" were corrected.  *Id.*

6       For reasons explained above, the Court cannot conclude that Defendants acted

7  arbitrarily and capriciously when they relied on Dr. Congdon's analysis in the

8  Supplemental Report.  Plaintiffs therefore have failed to establish the basis for Claim 6.

9       **D.**     **Claim 7.**[16]

10       As with Claim 6, Plaintiffs devote only two paragraphs of their motion for

11  summary judgment to Claim 7, and as with Claim 6, their arguments in support of

12  Claim 7 are based entirely on the alleged flaws in Dr. Congdon's Supplemental Report.

13  Doc. 41 at 19-20.  Plaintiffs assert that "the Forest Service's inadequate analysis of the

14  hydrologic impacts of groundwater pumping rendered its analysis of the impact such

15  pumping would have on threatened and endangered species inadequate." *Id.* at 19.

16       For reasons explained above, the Court cannot conclude that Defendants acted

17  arbitrarily and capriciously when they relied on the Supplemental Report.  Plaintiffs

18  therefore have failed to establish the basis for Claim 7.

19       The Court also notes that the Forest Service did consult with the United States

20  Fish and Wildlife Service ("USFWS") in June 2009 concerning the BRLE's potential

21  effect on endangered species, and that the USFWS issued a letter authorizing the Forest

22  Service to proceed with the exchange.  Doc. 48 at 28.  The letter concluded that the land

23  exchange "may affect [individuals], but it is not likely to have an adverse effect on any

24

25         [16] A plaintiff who raises a claim under the ESA is required to provide the

26  defendant agency with 60 days' notice.  16 U.S.C. § 1540(g).  Plaintiffs did not do so.
Plaintiffs argue, however, that they are asserting Claim 7 under the APA, not the ESA.

27  The Court will accept Plaintiffs assertion that their claim is made solely under the APA.
It therefore is not subject to the 60-day notice requirement.  *Am. Rivers v. Nat'l Marine*

28  *Fisheries Serv.*, 126 F.3d 1118, 1124 (9th Cir. 1997).

1   ESA listed or proposed species." *Id.*

2   **VII.   Conclusion.**

3           Plaintiffs' claims are either barred by res judicata or collateral estoppel, or fail to

4   show that the Forest Service's approval of the BRLE was "arbitrary, capricious, an abuse

5   of discretion, or otherwise not in accordance with the law" under 5 U.S.C. § 706(2)(A).

6   As a result, the Court will grant summary judgment in favor of Defendants.

7           **IT IS ORDERED:**

8           1.      Defendants' cross-motion for summary judgment (Doc. 48) is **granted**.

9           2.      Plaintiffs' motion for summary judgment (Doc. 41) is **denied**.

10          3.      The Clerk is directed to terminate this action.

11          Dated this 16th day of February, 2011.

12

13

14          _____

15                      David G. Campbell
                     United States District Judge
16

17

18

19

20

21

22

23

24

25

26

27

28

- 34 -